# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| AGRIGENETICS, INC. d/b/a MYCOGEN SEEDS, | |
| Plaintiff, | Case No. 1:08-cv-00802-TWP-TAB |
| vs. | |
| PIONEER HI-BRED INTERNATIONAL, INC., | **FILED UNDER SEAL** |
| Defendant, | |

## ENTRY ON PLAINTIFF'S PARTIAL SUMMARY JUDGMENT

Plaintiff Agrigenetics, Inc. d/b/a Mycogen Seeds formerly d/b/a Mycogen Plant Sciences ("Mycogen"), filed this action for breach of contract and declaratory judgment. Defendant, Pioneer Hi-Bred International, Inc. ("Pioneer"), counterclaimed for declaratory judgment. This matter comes before the Court on Mycogen's Motion for Summary Judgment on whether Pioneer has breached the relevant terms and requirements of the Section 4.2 of the 1995 Collaboration Agreement. The issues have been fully briefed. Moreover, the Court entertained oral arguments on August 24, 2010,

For the reasons stated herein, the Court **GRANTS** Agrigenetics, Inc. d/b/a Mycogen Seeds (Mycogen) a Partial Summary Judgment.

### I. FACTUAL BACKGROUND

Mycogen, a seed company based in Indianapolis, Indiana developed technology relating to gene encoding. At the time of the Collaboration Agreement ("Agreement"), Mycogen owned and controlled technology and patent rights relating to genes from bacteria called Bacillus thuringiens ("*Bt* genes or *Bt* traits") which had previously been found effective in killing

different crop pests, such as corn borer and corn rootworm. Although Mycogen had rights to the relevant types of *Bt* genes, it lacked the technology and expertise to insert and breed such genes into multiple corn plants—a step necessary to capitalize on the potential value of its gene library. [Dkt. 70 at 1-2].

At the time of the Agreement, Pioneer was one of the largest hybrid seed corn companies in the world. Pioneer developed, owned, and controlled certain technology relating to (1) plant breeding and genetics and (2) the introduction and expression into plants of genes encoded with insecticidal proteins of the Bacillus species. Both Mycogen and Pioneer saw the potential benefit of collaboration between the two companies. Mycogen saw value in working with "the leading seed company" because Pioneer's use of Mycogen technology would publicize and legitimize the quality of that technology, perhaps opening other doors for Mycogen down the road. [Dkt. 70-3 at 40:1-7]. And Pioneer recognized the value in procuring and incorporating *Bt* traits into its own commercial crops.

Mycogen and Pioneer entered into the Agreement with the goal of combining their respective technologies and patent rights and financial and marketing capabilities in order to create a seed corn resistant to mites, insects, and nematodes. The Agreement involved four essential components:

(1) Combine all current and future BIP genes and enabling technology and patent rights of both parties under joint Pioneer/MPS (Mycogen Plant Sciences) research programs … for genetically engineered insect, mite and nematode resistance traits thru transformation with BIP genes to control certain pests of each crop;

(2) Create an environment and structure under the joint Pioneer/MPS research and development programs to allow MPS and Pioneer … to work closely so as to best utilize technical talent, ingenuity, and core competencies of both companies;

2

(3) Provide each of MPS and Pioneer with the **commercial rights** to any BIP insect, mite and nematode resistance traits developed under the Pioneer/MPS joint research and development programs for each party to breed such traits into their respective crop parent lines and to produce and sell their own hybrids and varieties containing such traits … ;

(4) Provide MPS with the **exclusive right to license** BIP insect, mite and nematode resistance traits developed under the Pioneer/MPS joint research and development programs to third parties … subject to certain restrictions … [Dkt. 1-1 at 2].

The Agreement contemplated that Pioneer "would jointly develop the trait with [Mycogen and] would be free to then incorporate the trait into [Pioneer's] germplasm and market [Pioneer's] seed, and that [Mycogen] . . . at the time would have the ability to sublicense that trait to others in the industry." [Dkt. 50 at 5]. In summary, at the time of the execution of the Agreement, Mycogen alone had technology and Pioneer had sales and marketing but combined they were able to achieve the goal of creating an Insect Resistant BIP corn containing the *Bt* trait. In contemplation of the potential success of the collaboration, Article 4 of the Agreement was crafted to articulate each parties grant of rights. Section 4.2 of the Agreement, which is at the heart of the litigation before the Court, granted Pioneer a perpetual, world-wide, non-exclusive license. This provision articulates the rights, responsibilities, and conditions that must be met in order make use of the commercial license.

After years of research and development backed by Pioneer's $51 million dollar investment, their collaborative effort proved to be a success. As a result of their collaborative effort, Pioneer and Mycogen had finally created an Insect Resistant BIP corn by successfully incorporating the *Bt* trait into seed corn. This seed corn was termed "Herculex®" and is to this

day identified in the marketplace as Herculex®. The trademark Herculex® is currently owned by Dow AgroSciences, an Indianapolis-based Affiliate[1] of Mycogen. *Id*. at 6; (citations omitted).

In 2003, Pioneer and Mycogen began selling, on a limited basis, corn seed containing the Herculex® trait. [Dkt. 70-8 at 39:12-16]. Approximately two years later in 2005, after losing between ten and fifteen percent of their market share in the hybrid corn seed market, Pioneer decided that the most effective way to overcome the regional market barriers was to implement "second-brand marketing." Second-brand marketing consists of offering, through third-party independent seed companies, different products with a "different value proposition" and different price. Through this market segmentation, Pioneer sought to reach farmers who might not otherwise purchase products sold under the Pioneer® flagship brand. [Dkt. 70-5 at 216:7-14]. In 2008, Pioneer began implementing its second-brand strategy and contracted with third-party seed companies to sell seeds produced by Pioneer, some that utilized the Herculex® technology jointly developed with Mycogen, some that did not.[2] Pioneer described this second-brand marketing as its "PROaccess" business strategy.

Pursuant to the PROaccess business strategy, Pioneer entered into contracts with independent seed companies by which those companies agreed to purchase and resell seed corn produced by or for Pioneer that included the Bt traits developed under the Agreement. [Dkt. 50 at 10]; [Dkt. 50-3 at 69, l.14-21]. Pioneer entered into contract agreements with the following independent seed companies as part of its PROaccess business strategy – Beck's, Seed

---

[1] The Collaboration Agreement defines the term Affiliate to mean (1) with respect to MPS, any parent corporation of MPS (Mycogen d/b/a Agrigenetics), or any partnership, joint venture or subsidiary in which MPS or such parent corporation has a fifty percent or greater ownership interest and (2) with respect to Pioneer, any partnership, joint venture or subsidiary in which Pioneer has a fifty percent ownership interest.

[2] Pioneer distributes both Herculex® and non-Herculex® products under its XL™ brand. In 2010, less than half of the XL™ brand hybrids distributed by Beck's contain Herculex®. (*See* Ex. 6, Beck's Hybrids 2010 Seed Corn Products.).

Consultants, Doebler's, Hoegemeyer, NuTech, AgVenture, Burrus and Terral. Of these third party seed companies, Beck's, Burrus, AgVenture, Hoegemeyer, Seed Consultants, and Terral were sub licensees of Mycogen in 2004. [Dkt. 50 at 12]; [Dkt. 50-3 at 69, l.14-21]; [Dkt. 50-10]; [Dkt. 50-3 at 195, l.11 to 197, l.4]. Thus, when Pioneer implemented its PROaccess strategy, third party seed companies which had previously acquired licenses and paid royalties to Mycogen to sell Herculex® seed, now purchased Herculex® seed through Pioneer. [Dkt. 50 at 13]; (citations omitted). At issue before the Court is the determination of whether Pioneer's PROaccess strategy violates requirements placed onto Pioneer by Section 4.2 of the Agreement. Section 4.2 of the Agreement reads as follows:

**Article 4: Grant of Rights - Section 4.2**

Pioneer and its Affiliates have the right under the license granted by MPS to Pioneer under this Section 4.2 to permit distributors, agents and resellers to distribute and sell Insect Resistant BIP Crops in branded bags of Pioneer or Pioneer Affiliates using such proprietary packaging and displaying such Pioneer or Pioneer Affiliate brand name identification with the same prominence and position as used and displayed by Pioneer or by any Pioneer Affiliate in the ordinary course of its business. Such proprietary packaging displaying the brand name identification of Pioneer or Pioneer Affiliate also may display the name, logo or trademark of any distributor, agent or re-seller that distributes or sells Pioneer planting seed.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment and provides that summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). As articulated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole. *Id.* at 327. In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F. 3d 582, 584 (7th Cir. 2009).

Although reasonable inferences are to be drawn in favor of the non-movant, a genuine issue of material fact only exists when there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Baker v. Elmwood Distrib., Inc*., 940 F. 2d 1013, 1016 (7th Cir. 1991). It is not enough for the non-movant merely to raise factual arguments that cast "some metaphysical doubt as to the material facts." *Baker v. Elmood*, 940 F. 2d 1013; quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A party who bears the burden of proof on a particular issue … must affirmatively demonstrate, by specific factual allegations, that there is [or is not] a genuine issue of material fact that requires trial."

The Seventh Circuit favors summary judgment as a means to resolve disputes over the interpretation of a contract. *Murphy v. Keystone Steel & Wire Co.,* 61 F.3d 560, 564-65 (7th Cir.1995). *Metalex Corp. v. Uniden Corp. of America,* 863 F.2d 1331, 1333 (7th Cir.1988) ("[c]ontract interpretation is a subject particularly suited to disposition by summary judgment"). Contract disputes are especially well suited to resolution by summary judgment when the terms of the contract are unambiguous. "If a contract is unambiguous, by definition no issues of material fact exist regarding the contract's interpretation; that interpretation is a question of law for the court." *Metalex,* 863 F.2d at 1333.

The initial inquiry for the district court is thus the issue of whether the contract in question is ambiguous. *Majchrowski,* 6 F.Supp.2d at 963. A contract is not ambiguous "if it is susceptible to only one reasonable interpretation." *Murphy,* 61 F.3d at 565. In other words, the mere fact that parties disagree over the meaning of a contractual term does not indicate that the contract is ambiguous. *Majchrowski,* 6 F.Supp.2d at 963. Ambiguity exists only when "both parties interpretive positions [are] reasonable." *Id.*

Seventh Circuit precedent dictates that the existence of an ambiguous term in a contract will preclude summary judgment *because* the resolution of the ambiguity requires an examination of evidence surrounding the parties' intentions and state of mind. *BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 359 (7th Cir. 2009) (emphasis added). In contrast, the governing laws of California and Iowa both allow the *consideration and examination* of extrinsic evidence in order to identify an ambiguity within a contract.[3] When faced with a dispute over the meaning of a contractual provision and potential ambiguity, the court must first determine whether the provision is ambiguous, i.e., whether the language of the provision is capable of different, yet reasonable interpretations. *Falkowski v. Imation Corp.*, 132 Cal. App. 4th 499, 505 (2005). Any determination of meaning or ambiguity should only be made in the light of relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties; but after the transaction has been shown in all its length

---

[3] When the collaboration Agreement was executed in 1995, Pioneer's headquarters were in Iowaa and Mycogen's headquarters were in California. As conceded to by both parties, choice of law analysis is not necessary because the contract law of California and Iowa are substantively the same.

and breadth, the words of an integrated agreement remain the most important evidence of intention. *Pillsbury Co., Inc. v. Wells Dairy, Inc*. 752 N.W.2d 430 (Iowa 2008).

## III. DISCUSSION

Based upon the structure and language of Section 4.2, Mycogen and Pioneer put forward two contrasting analyses regarding the requirements imposed on Pioneer by Section 4.2 of the Agreement.

### A. Structure of Section 4.2

To support its argument that Section 4.2 is clear and unambiguous, Mycogen points to the structure of Section 4.2 and the use of the verbs *use* and *display*.[4] Mycogen contends that because of the use of these verbs, Section 4.2 dictates two separate requirements of Pioneer: when distributing seed covered by this Agreement through distributors or resellers, the seed must be in branded bags which (1) *use* Pioneer proprietary packaging and (2) *display* Pioneer brand name identification. Pioneer, rather than ascertain two distinct required elements, construes the provision to dictate a more general, interrelated requirement of displaying brand name identification as a component of using proprietary packaging.

Although the Court agrees with Pioneer's contention that having brand name identifiers on the packaging factors into it being considered proprietary packaging, the Court concludes that construction and plain reading of Section 4.2 places two distinct conditions on Pioneer's ability to distribute through agents, resellers, and distributors. The plain reading of the applicable portion of 4.2, places a restriction on Pioneer requiring both the use of Pioneer proprietary packaging and the displaying of the Pioneer brand name identification on the proprietary

---

[4] Section 4.2 in pertinent part states: Pioneer and its Affiliates have the right … to permit distributors, agents and resellers to distribute and sell Insect Resistant BIP Crops in branded bags of Pioneer or Pioneer Affiliates **using** such proprietary packaging and **displaying** such Pioneer or Pioneer Affiliate brand name identification with the same prominence and position as used and displayed by Pioneer or by any Pioneer Affiliate in the ordinary course of its business.

8

packaging, with the same prominence and position as used in the ordinary course of business. The provision's structure and deliberate use of the two verbs support the contention that Section 4.2 is clear and unambiguous in its two requirements.

### B. Undefined Terms in Section 4.2

Unfortunately for Pioneer, Agrigenetics, and the Court, the Agreement defined neither "brand name identification" nor "proprietary packaging". The undefined and ultimately disputed terms, "proprietary packaging" and "brand name identification" are found in both Section 4.2 and Section 4.3 of the Agreement.

In determining if the disputed Section 4.2 provision is ambiguous, the Court first looks to the language of the contract and the generally accepted meaning of the disputed terms. 11 RICHARD A. LORD, WILLISTON ON CONTRACTS, § 30:5 (4th ed. 1993). Undefined terms in a contract are not necessarily ambiguous and are generally assigned their "plain, ordinary, and popular meaning." *Federated Rural Elec. Ins. Corp. v. Certain Underwriters at Lloyds*, 293 Fed. Appx. 539, 540 (9th Cir. 2008); *see also Queen City Farms, Inc. v. Central Nat. Ins. Co. of Omaha,* 882 P.2d 703, 712 (Wash. 1994); s*ee also Truck Ins. Exch. v. Rohde,* 303 P. 2d 659, 664 (Wash. 1956). If the designation of an undefined and disputed provision term as unambiguous is contested or undeterminable, the Court may interpret a contract provision – and thus potentially identify an ambiguity – by considering extrinsic evidence. *Dore v. Arnold Worldwide, Inc.*, 139 P. 3d 56 (Cal. 2006). Extrinsic considerations allow light to be shed on the situation of the parties, antecedent negotiations, the attendant circumstances, and the objects they were striving to attain. *Kroblin v. RDR Motels, Inc.*, 347 N.W. 2d 430, 433 (Iowa 1984).

California courts have articulated a helpful method of appropriate contract interpretation involving a two-step process: (1) the Court provisionally receives all credible evidence

9

concerning the parties intentions to determine ambiguity, i.e., whether the language is *reasonably susceptible* to the interpretation urged by a party, and (2) if in light of the extrinsic evidence the Court decides the language is *reasonably susceptible* to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step-interpreting the contract. *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (2nd Dist. 2004) (emphasis added). Taking these factors into consideration, the Court now turns to the undefined and contested contract terms.

### i. Ordinary Course of Business

The Court begins its discussion with the phrase "ordinary course of business" which is included in Section 4.2 of the Agreement. The pertinent language is as follows, "[Pioneer must]…sell in Pioneer … branded bags using such proprietary packaging and displaying such Pioneer … brand name identification with the same prominence and position as used and displayed by Pioneer … in the ordinary course of its business."

Mycogen argues that the trademark symbols and packaging used by Pioneer violate Section 4.2 of the Agreement because neither is used by Pioneer in its "ordinary course of business". Citing to two bankruptcy cases, Mycogen asserts that the determination of whether a challenged practice is in the ordinary course of business presupposes a past practice that can be compared with the challenged practice, so as to not permit the determination of ordinary course of business simply because it is now being done. Mycogen reasons that if Pioneer has admittedly not used the PROaccess trademarks or the PROaccess packaging in any capacity before implementing this strategy, it is "ipso facto" not in the ordinary course of its business.

Pioneer approaches the "ordinary course of business" provision language by drawing a relevant supposition; contending first that the ordinary course of business requirement of Section 4.2 refers to the prominence and position of the brand name identification as used by Pioneer or a

10

Pioneer Affiliate, not the brand name identification requirement itself. Further, Pioneer does not directly address the "ordinary course of business" language in relation to proprietary packaging beyond stating that the Agreement was not intended to limit Pioneer to the same packaging used in 1995.

The Court finds that the ordinary course of business language of Section 4.2 places a requirement on Pioneer to both *use* proprietary packaging it uses in its ordinary course of business and *display* its brand name identification with the same prominence and position as displayed by Pioneer in its ordinary course of business. As bolstered by Black's Law Dictionary definition, the ordinary course of business phrase refers to the common usage and customs of a particular community, here a particular company. The question then becomes whether Pioneer has fulfilled this requirement based upon what is common and customary to Pioneer.

### ii. Proprietary Packaging

The first requirement of the 1995 Collaboration agreement is that the distributors must be required to resell the seed in bags "using such proprietary packaging" "as used… by Pioneer…in the ordinary course of its business.".

Pioneer asserts that "packaging" is a broad term, used to define all aspects of a products covering such as those used to attract attention, assist in promotion, or impart essential or additional information, while "proprietary" means one that possesses, owns, or holds exclusive right to something. [Dkt. 70 at 26]. Pioneer argues that the inclusion of brand name identifier on the packaging further declares that the plain meaning of the term "proprietary packaging" is packaging which Pioneer possesses, owns, or holds. *Id*.

Pioneer cited, and submitted extrinsic evidence to support, the followings reasons as to why the PROaccess bags used constitute Pioneer proprietary packaging:

(1) Pioneer has final authority over the design and development of the "packaging" (*i.e.,* the bags) used to sell its seed under these second brands;
(2) Pioneer purchases and owns the bags used to distribute its products;
(3) The bags prominently display the Pioneer-owned brand name identifiers and trademarks;
(4) The bags contain 100% Pioneer germplasm;
(5) Pioneer provides the legal language contained on the bags and tags, including the warranty, warnings and regulatory language; and
(6) The PROaccess partners are prohibited from altering the bags or tags, using alternate brand name identifiers, or selling Pioneer seed in any bag other than that approved, developed, purchased and owned by Pioneer. *Id*. at 9.

Pioneer lastly asserts that its PROaccess bags are not merely owned by Pioneer; they are the product of Pioneer's artistic, legal, regulatory, licensing, marketing, and managerial efforts and used in Pioneer's seed corn business. [Dkt. 72-22 at ¶ 8]; [Dkt. 77-4 at 76:19-77:10, 254:4-13].

Alternatively, Mycogen argues that the proprietary packaging language of Section 4.2 is unambiguous. Mycogen characterizes proprietary packaging as what remains once the brand name identification of Pioneer and the name, logo, and trademark of the distributor have been removed. [Dkt. 50 at 17].

In support of its argument, Mycogen asserts that Pioneer has possessed the same elements of packaging - the color combination, bag structure, and brand name identifier - since the Agreement was formed in 1995; arguing that these specific elements of their bags allow farmers to immediately associate the product with Pioneer. [Dkt. 50-2 at 9-12; 18-22] (stating that to his knowledge Pioneer corn product since 1995 had not been sold directly to farmers in anything other than the "yellow" Pioneer flagship bag).

While not dispositive, Mycogen's citing of Pioneer's prior exclusive use of these elements and packaging, lends credence to its argument. The longevity and immediate association of the color structure and scheme of the Pioneer bag to Pioneer, allows those elements to become proprietary to Pioneer. This was confirmed by Robert C. Iwig:

> Q: Does it have the word "Pioneer" in letters approximately 2 ¼ inches high right in the middle?
> A: It appears to be approximately that height, yes.
> Q: And does it have the color – the color yellow in the bottom half and green in the top?
> A: Well, yeah, green – green and white in the top half, yellow in the bottom.
> Q: Okay. Do you – Do you consider that to be the proprietary Pioneer bag identification we talked about earlier?
> A: That is a proprietary bag of Pioneer. [*Id*. at 9-22].

As confirmed by Pioneer's own witness, the distinct and identifiable combination of colors, along with the layout of the bag, unarguably constitute proprietary packaging of Pioneer.

The meaning of proprietary packaging is further illuminated by the testimony of Won Sop Hyon in consideration of a Pioneer branded bag.

> Q: Okay. Do you consider the way that bag looks to be proprietary to Pioneer?
> A: Yes.
> Q: Why is it proprietary to Pioneer the way the bag looks?
> A: We've had this design for a very, very long time.
> …
> Q: Do you consider the color scheme proprietary to Pioneer in the context of corn?
> A: Yes.
> Q: What is the – What is the color scheme you consider proprietary to Pioneer?
> A: The orange shade. [Dkt. 50-3 at 9-10 13-25; 1-6].

Both depositions support the reading of proprietary packaging to require that the *look* of the packaging be proprietary to Pioneer - that Pioneer own and control the *look*. Although this

may appear comparable to the manner in which Pioneer characterized the proprietary packaging requirement, it is not. The Court finds the broad construction given by Pioneer to the term proprietary packaging unpersuasive.

While the Court does not find that the bag colors *alone* are what constitute proprietary packaging, the overall look to the bag once the words and symbols are removed contributes to the finding of proprietary packaging. Pioneer has offered no extrinsic evidence that would support the contention that Pioneer's reading of Section 4.2's "proprietary packaging" requirement is reasonable. Ownership of the physical bag alone, or even in combination with factors given by Pioneer – such as having final approval of the bag design - does not necessitate the conclusion that it is proprietary packaging.

Although proprietary packaging need not be limited exclusively to the packaging employed by Pioneer since 1995, according to the terms of the Agreement it must still be proprietary packaging of Pioneer. Thus, in order for the packaging (or "look") to be proprietary, it must be capable of being used without the permission or agreement of another, non-Affiliate party. Neither the extrinsic evidence nor plain reading of the contract terms supports the conclusion that adding a trademark to a PROaccess company's branded bag and making cosmetic changes in its structure, transforms the bag into packaging which is proprietary to Pioneer. The colors and layout of the proffered "Beck's XL" bags are unarguably proprietary to non-Affiliate Beck's, and only Beck's, and would constitute Beck's trade dress.[5] Thus, the

---

[5] Trade dress must be distinctive and nonfunctional. Cause of Action for Trade Dress Infringement under § 43(a) of the Lanham Act [15 USC § 1125(a)], 7 COA2d 725. Pioneer states that Caulder testified that the printing and ownership of the packaging – and the displaying of the company brand or logo – was what he understood and intended "proprietary packaging" to mean. [Dkt. 70 at 28-29]. This restatement is a mischaracterization of Caulder's overall testimony. Former Mycogen CEO Caulder initially stated that from Mycogen's prospective, proprietary packaging was "trade dress – how the package looked." [Dkt. 70-3 at 58-59.]. Caulder repeatedly stated that the proprietary packaging was the overall *look* and merely acceded that

packaging employed by Pioneer in its PROaccess strategy is in direct conflict with the evidenced meaning of the Pioneer proprietary packaging requirement of Section 4.2.

The extrinsic evidence presented to the Court reveals that Pioneer's proffered characterization of the term 'proprietary packaging' is not reasonable. Under California law, the language of a contract governs its interpretation if the language is clear and explicit, and does not involve an absurdity. Cal. Civ. Code § 1638 (West 2003). For a contract [term] to be ambiguous, it must be susceptible to at least two different *reasonable* interpretations. *Sterling Builders Inc. v. United Nat. Ins. Co.,* 79 Cal. App. 4th 105, 111 (2000) (emphasis added). Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists. *Roxford v. Ameritech Corp.*, 335 F. 3d 661, 664 (7th Cir. 2003); *see also Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.,* 855 P. 2d 1263 (1993) (quoting *Reserve Ins. Co. v. Pisciotta*, 640 P.2d 764 (1982)

The Court must ultimately determine based upon the language of the contract and proffered extrinsic evidence whether the interpretation of the provision offered by Pioneer is reasonable, and thus an ambiguity exists and summary judgment is precluded. The Court finds that it is not. The Court finds that Pioneer's determination of the meaning and rights and responsibilities associated with the term proprietary packaging goes against the intent of the contracting parties as evidenced by the structure, words used, depositions taken, and holistic reading of the contract and is thus unreasonable.

---

printing/ownership and displaying a brand/logo were factors that contributed to proprietary packaging. This focus on the appearance and *look* of the packaging by Caulder is consistent with the Supreme Court's interpretation of trade dress. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764, (1992) (The 'trade dress' of a product is essentially its total image and overall appearance).

### ii. Brand Name Identification

In addition to "using…proprietary packaging," the distributors of Insect Resistant BIP crops must resell the seed in bags "displaying such Pioneer…brand name identification with the same prominence and position as…displayed by Pioneer…in the ordinary course of its business."

The Court finds that the extrinsic evidence offered for consideration, reveals a latent ambiguity as to the requirements regarding displaying Pioneer brand name identifications. As previously stated, extrinsic evidence may be examined to expose a latent ambiguity and reveal more than one possible meaning to which the language of the contract is reasonably susceptible. *Dore v. Arnold Worldwide, Inc*., 139 P.3d 56, 60 (Cal. 2006). The Court finds that based on the extrinsic evidence proffered, the interpretation asserted by Pioneer that the word "Pioneer" in the phrase "Pioneer or Pioneer Affiliate brand name identification" simply refers to the corporate entity that owns whatever brand name will be used, is reasonable. The testimony of Mr. Jerry Caulder, Mycogen's CEO at the time of the Agreement, was particularly insightful. In his deposition testimony, Mr. Caulder conceded that Pioneer was not limited to selling its products through a specific, pre-existing Pioneer brand, and that "it wasn't [Mycogen's] intention to prevent [Pioneer] from marketing under any—any brand Pioneer owned." [Dkt. 70-3 at 54:19-22]. Rather, Pioneer was free to sell Insect Resistant BIP Crops in "packaging that was produced to the order of Pioneer and would bear *one of Pioneer's brands*." [*Id.* 58:20-25] (emphasis added). According to Mr. Caulder: "I, quite frankly, didn't care what brand [Pioneer] sold [seed] under," as long as Mycogen was credited for the technology in the bag. [*Id*. 54:14-15]. After careful examination of the extrinsic evidence proffered by both parties, the Court finds that Pioneer's assertion that the PROacess companies display a Pioneer brand name identification is

reasonable. However, Pioneer is still in breach of Section 4.2 of the Collaboration Agreement because trademarks such as XL have never been used by Pioneer in the ordinary course of its business.

At summary judgment stage, a judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Based on the aforementioned findings, the Court does not find a triable issue of material fact in regard to the proprietary packaging requirements as used in the ordinary course of Pioneers business and the requirement to resell the seed in bags displaying such Pioneer brand name identification with the same prominence and position as displayed by Pioneer in the ordinary course of its business as placed upon Pioneer by Section 4.2.

Partial Summary judgment in favor of Agrigenetics, Inc. d/b/a Mycogen Seed, Inc. is warranted on the claim that Pioneer has breached the relevant terms and requirements of Section 4.2 of the 1995 Collaboration Agreement.

IV. **CONCLUSION**

For the reasons stated herein, Plaintiff's, Agrigenetics, Inc. d/b/a Mycogen Seeds is **GRANTED** Partial Summary Judgment.

IT IS SO ORDERED.

Date: 11/09/2010

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution attached.

Distribution to:

**Deborah Pollack-Milgate**
BARNES & THORNBURG
11 S. Meridian Street
Indianapolis, IN 46204-3535

**Donald E. Knebel**
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204

**Jennifer Lynn Schuster**
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204

**Brian C. Swanson**
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard St., Suite 300
Chicago, IL 60654

**Christopher J. Braun**
PLEWS SHADLEY RACHER & BRAUN
1346 North Delaware Street
Indianapolis, IN 46202

**Lindley J. Brenza**
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
1899 Wynkoop St., 8th Floor
Denver, CO 80202

**Shelley M. Jackson**
PLEWS SHADLEY RACHER & BRAUN
1346 North Delaware Street
Indianapolis, IN 46202

**Sundeep K. Addy**
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
1899 Wynkoop St., 8th Floor
Denver, CO 80202

**Todd J. Janzen**
PLEWS SHADLEY RACHER & BRAUN
1346 North Delaware Street
Indianapolis, IN 46202